```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF CONNECTICUT
 2

 3   CHRISTINA OTHON,              )
                                  )
 4              Plaintiff,         )
                                  )           3:18-CV-00958
 5   vs.                           )           Bridgeport, CT
                                  )
 6   WESLEYAN UNIVERSITY,          )
                                  )
 7              Defendant.         )
     _____)
 8

 9              TRANSCRIPT OF MOTION PROCEEDINGS
            BEFORE THE HONORABLE KARI A. DOOLEY,
10               UNITED STATES DISTRICT JUDGE
                      March 18, 2019
11

12   APPEARANCES:

13   For the Plaintiff,       Heena Kapadia
                              Law Office of Heena Kapadia
14                            472 White Plains Road
                              Trumbull, CT 06611
15

16   For the Defendant,       Matthew K. Curtin
                              Murtha Cullina, LLP
17                            182 Asylum Street, 29th Floor
                              Hartford, CT 06103
18

19   Official Court Reporter:  Traci D. Walker, RMR-CRR-CRC
                              Official Court Reporter
20                            United States District Court
                              915 Lafayette Boulevard
21                            Bridgeport, CT 06604

22

23

24

25
```

```
 1              COURTROOM DEPUTY:  All rise.  The Honorable United
 2   States District Court is now open, the Honorable Kari A. Dooley
 3   presiding.
 4              Please be seated.
 5              THE COURT:  I feel like the little kid at the
 6   Thanksgiving table in this chair.
 7              Good morning.
 8              MS. KAPADIA:  Good morning.
 9              MR. CURTIN:  Good morning, Your Honor.
10              THE COURT:  This is the matter of Othon vs. Wesleyan
11   University.
12              Counsel, please identify yourselves for the record.
13              MS. KAPADIA:  Heena Kapadia for the plaintiff.
14              MR. CURTIN:  Matthew Curtin on behalf of Wesleyan
15   University, and with me is my colleague, Martha Royston.
16              MS. ROYSTON:  Good morning.
17              MR. CURTIN:  Also with me is my client, the General
18   Counsel at Wesleyan University, David Winakor.
19              THE COURT:  Good morning.  Okay.
20              We scheduled oral argument on the defendant's motion
21   to dismiss.  I guess the Court is being asked to cast its vote
22   in what is, at this juncture, an unresolved issue in the Second
23   Circuit.
24              Let me -- obviously, I'm not going to be writing on a
25   clean slate.  I would ask you to -- I'm not going to limit you
```

1    in terms of what it is you'd like to say; but, obviously, the
2    question for me is what's the Supreme Court -- can we predict
3    what the Supreme Court is going to do when and if this issue is
4    presented to it, and can we predict what the Second Circuit is
5    going to do when and if this issue is presented to it.
6            I will note that the Second Circuit had that
7    opportunity, did not need to decide the issue in the *Summa* case
8    and didn't, as near as I can tell, telegraph its view of the
9    issue.
10           So I have questions for both of you but, right now,
11   Mr. Curtin, it's your motion, your floor.
12           MR. CURTIN:  Thank you, Your Honor, and thank you for
13   hearing our motion today.
14           We're moving to dismiss Counts Three and Four of the
15   amended complaint.  The issue is a straightforward legal issue.
16   I don't think the facts are in dispute.
17           The plaintiff was an employee of Wesleyan University.
18   She's brought a claim of gender discrimination in violation of
19   Title VII, gender retaliation in violation of Title VII, and
20   similar claims under Title IX, discrimination and retaliation
21   claims under Title IX.  Her Title IX claims are grounded in her
22   employment with Wesleyan University, not as a student at
23   Wesleyan University.
24           So the factual scenario here isn't at dispute.
25   Really, what the Court is being asked to decide is whether it

1   will side with the split of authority that finds that there is

2   no private cause of action for an employee of a federally

3   funded educational institution pursuant to Title IX, the

4   Education Amendments Act of 1972.

5            Our position is that the Second Circuit and the

6   Supreme Court will find with -- will find in favor of our

7   position, which is the majority position within the District of

8   Connecticut, that there is no private cause of action in the

9   employment context under Title IX.

10           The case law, to date, bears out that the District of

11  Connecticut has repeatedly found that there is no private cause

12  of action under Title IX in the context of employment.  The

13  first case in the District of Connecticut that I'm aware of to

14  hold that there's no private cause of action is the *Urie vs.*

15  *Yale* case, which was a 2004 case before Judge Chatigny.  The

16  issue -- the case that seems to be the crux of plaintiff's

17  opposition, which is *Jackson vs. Birmingham*, came after the

18  *Urie* case in 2005.  But then again, in 2017, 12 years after the

19  *Jackson vs. Birmingham* case was decided, Judge Bryant again

20  found that there is no private cause of action for an employee

21  in the context of Title IX for discrimination or retaliation,

22  and that was the *Uyar vs. Seli* case.

23           I'll note that *Jackson vs. Birmingham*, which is the

24  primary case the plaintiff relies upon, makes no mention of the

25  Circuit split in the context of employment.  It doesn't discuss

```
 1   claims of employment discrimination.  Instead, it basically
 2   discusses associational discrimination, which is a coach
 3   bringing a claim on behalf of a group of students.  It is not
 4   the same factual scenario that is at issue here, which is
 5   basically a straightforward employment discrimination claim
 6   wherein plaintiff claims that she has been discriminated
 7   against in the terms and conditions of her employment, not on
 8   behalf of students that she was teaching or coaching, but that
 9   she, herself, was discriminated against and retaliated against.
10   And she is trying to vindicate her rights under Title IX.
11           THE COURT:  And Title VII.
12           MR. CURTIN:  And Title VII.  Duplicative claims based
13   on the same nucleus of facts.
14           THE COURT:  All right.  Thank you.
15           Ms. Kapadia, how are you?
16           MS. KAPADIA:  Thank you.
17           THE COURT:  I'm sorry.  I have a question.  I'm going
18   to let you argue.  I have a question for you, though.
19           A lot of the cases that really needed to decide this
20   issue involved a plaintiff that proceeded under Title IX and
21   not Title VII.  You have proceeded under both.
22           MS. KAPADIA:  Yes.
23           THE COURT:  And there's not a lot of case law, but it
24   appears that the determination on the merits of the Title IX
25   claim and the Title VII claim are identical in terms of what
```

1  must be proven.

2          So why -- well, why?  I guess why.

3          MS. KAPADIA:  Okay.  So one is the remedies are

4  different, Your Honor.  Title VII has limitations on economic

5  damages that Title IX does not have.  Title VII also has

6  limitations, depending on whether the burden of proof is met by

7  mixed motive or direct proof.  So the remedies are different.

8          THE COURT:  Okay.  And because there hasn't been a

9  really robustly developed body of case law in this context

10  under Title IX, where would the -- from what source would the

11  Court draw substantive law in terms of things like that:

12  Burden of proof, how -- the McDonnell Douglas framework, how it

13  works, what the burden is on the defendant in a shifting

14  analysis?  I mean, where does the Court draw from when I'm

15  being asked to recognize a cause of action that is not widely

16  recognized and litigated?

17          And we have an entire body -- we have a huge body of

18  case law until terms of Title VII.  So it's really what would

19  be your suggestion to the Court in terms of overseeing this

20  type of claim, since we don't have that out there?

21          MS. KAPADIA:  Well, what I have seen, Your Honor, is

22  in every -- even in the Connecticut statutes that govern

23  employment that have, you know, retaliation, not just

24  Connecticut Fair Employment Practices Act, but 31-51q, first

25  amendment, you know, 4-61dd, retaliation specifically for state

1    employees, 3151m that deals with whistle-blowers going to a

2    public agency.

3              THE COURT:  Right.

4              MS. KAPADIA:  -- everybody in the federal arena and in

5    Connecticut has pretty much used the McDonnell Douglas

6    framework, you know, sometimes varying a little bit in certain

7    exceptional circumstances, but typically that's the burden of

8    proof analysis.  So if I were to guess, I would think that that

9    is what the analysis would be.

10             The only thing -- I just wanted to say, Your Honor,

11   there are five circuits that have -- I mean, it's not as if --

12   yes.  Title IX is definitely much newer than Title VII and

13   there's this entire -- you know, thousands of cases and cases

14   under the Connecticut Fair Employment Practices Act that mirror

15   that and all of that.  But under Title IX, there are five

16   circuits that have now held that employees have a private right

17   of action.  And I would like to, if I could, Your Honor, just

18   go -- go through the analysis because --

19             THE COURT:  Yes, absolutely.  I didn't mean to --

20             MS. KAPADIA:  No, no, no.

21             THE COURT:  Yeah.  Please.

22             MS. KAPADIA:  Okay.  So first of all, there are

23   many -- you know, many of the cases involved go back to the

24   language of this statute, which refers to persons.  Not

25   students or people complaining about students.  It's persons.

1          The second thing that's relevant is the legislative
2     history.  I'm going to talk more about this later in my
3     argument; but in the North Haven Board of Education case, the
4     Second Circuit case, and then in the North Haven Board of
5     Education-Bell case, which is a partial appeal of that case,
6     the Court goes through exhaustively -- in exhaustive detail the
7     legislative history and repeatedly, you know, quotes the
8     Senators in saying we -- you know, this -- there are three
9     objectives here, and one of the objectives is to eradicate
10    discrimination in employment in these educational institutions,
11    and they talk about women being underrepresented, and so on.
12          So as I indicated, so there are five circuits.  First,
13    Fourth, Sixth, and Third have expressly addressed the issue.
14    The Tenth Circuit held that Title VII applies to Title IX
15    retaliation claims by a faculty member.  They didn't discuss
16    this specifically; but in the *Fox vs. Pittsburgh* case, which is
17    a 2017 case, that case, in that circuit, District Court
18    decision, reviews the appellate court decision in *Hyatt vs.*
19    *Colorado*, the Tenth Circuit decision, and says based on
20    everything that the Court says in there, if we were to guess,
21    there's no question that they will also rule with the First
22    Fourth, Sixth, and Third Circuits.
23          The two circuits that support the defendant's
24    position, the Fifth Circuit, that's out of Texas -- typically,
25    the Second Circuit does not align with Texas -- and the Seventh

1   Circuit.

2        And the interesting thing -- what I'd like to do, Your

3   Honor, is go through *Doe vs. Mercy*, which is the First -- let

4   me make sure that's the First Circuit --

5        THE COURT:  It's Third Circuit, by the way.

6        MS. KAPADIA:  -- Third Circuit's decision which goes

7   through, very carefully, the six Supreme Court decisions that

8   were the deciding factor for the Court.

9        So the first decision, which I think is one of the

10  most important decisions, is *Johnson vs. Railway Express

11  Agency*.  In that case, the Court confronted the issue of

12  whether Title VII displaced Section 1981, which is an older

13  law, still on the books today, that eradicates discrimination,

14  but it doesn't have any administrative requirement the way

15  Title VII does.

16       So in that case, the Court reviewed -- the Court

17  referred to the legislative history of Title VII and said

18  Title VII was not intended to displace other employment laws;

19  and, as far as we're concerned, the fact that one has an

20  administrative component and one has -- allows the party to go

21  right to litigation, that's not for us to decide.  That's for

22  Congress to decide.

23       So the Third Circuit started with that analysis and

24  said this issue was addressed by the Supreme Court in *Johnson

25  vs. Railway*, so we know that Title VII is not intended to be an

1   exclusive remedy for employment discrimination.

2          Then came the second decision, *Brown vs. General*

3   *Services*.  Now, in that case, there had been an amendment to

4   Title VII; and that amendment allowed federal employees to sue

5   under Title VII.  This time the Court was deciding whether that

6   is the exclusive remedy for federal employees or whether

7   federal employees can now undergo other statutes.  And in that

8   case, the Court said no, that was an express waiver of

9   sovereign immunity and held that *Johnson* didn't apply because

10  of that.  So they distinguished *Johnson* but -- but expressly

11  talked about it and said, We're not giving an alternative -- or

12  we're giving a consistent ruling.  *Johnson* dealt with private

13  rights.  This was an express waiver of sovereign immunity.

14          Then came the third case by the Supreme Court, which

15  is *Cannon*.  *Cannon* basically said a student can bring a private

16  right of action.  So that was that expansion.

17          Then the fourth case is the *North Haven* case, which

18  was from Connecticut.  That went to the Supreme Court.  And in

19  that case, the Court said Title IX covers employment

20  discrimination.  Title IX, therefore, allows regulations

21  designed to address the discrimination in employment.

22          So that was a female from the Trumbull School District

23  and a female from the North Haven School District that both

24  complained about discrimination, complained to the Title IX

25  office, and the Title IX -- Department of Education, rather.

UNITED STATES DISTRICT COURT

1   They attempted to take away the funding for the schools, and

2   then the schools appealed.  So that's the context in which --

3   that was strictly -- and that's where the courts, you know,

4   went through the legislative history.

5           Now, it didn't deal with a private right of action;

6   but the language was persuasive to the Third Circuit in that it

7   said, "Even if alternative remedies are available and their

8   existence is relevant, it rejoined.  Congress has provided a

9   variety of remedies at times overlapping to eradicate

10  employment discrimination."

11          So then came the next decision which is by the Supreme

12  Court, *Franklin vs. Gwinnett*, in which the Court said, well, of

13  course, it doesn't just -- it includes sexual harassment for

14  private right of action for a student, not an employee, but

15  said, of course, it doesn't just include regular retaliation;

16  it includes sexual harassment.

17          Then the final decision is *Jackson vs. Birmingham*.

18  And in that case, the employee was -- it was a claim, private

19  right of action, directly by an employee.  The employee had

20  made a complaint about retaliation with respect -- or when the

21  employee complained about student issues.

22          So what is particularly significant, Your Honor, about

23  that case is that they argued in that case that Jackson, the

24  plaintiff, was not entitled to invoke Title IX because he was

25  an indirect victim; that he wasn't the victim himself, so he

1  could not raise a Title IX complaint.  And here's what the

2  Court said, and this is on Page 179.  So it's 554 U.S. 179.

3        "The statute is broadly worded; it does not require

4  that the victim of the retaliation must also be the victim of

5  the discrimination that is the subject of the original

6  complaint.  If the statute provided instead that 'no person

7  shall be subject to discrimination on the basis of such

8  individual's sex,' then we would agree with the board."

9        "Title IX contains no such limitation.  Where the

10  retaliation occurs because the complainant speaks out about sex

11  discrimination the 'on the basis of sex' requirement is

12  satisfied.  The complainant is himself a victim of

13  discriminatory retaliation, regardless of whether he was the

14  subject of the original complaint."

15        I read that as the Court, the Supreme Court, in 2005

16  in *Jackson* saying it doesn't matter if the complaint was

17  because of the teacher's personal situation or on behalf of his

18  student.  So I think that language is particularly relevant.

19        Okay.  So going forward, one of the very interesting

20  things about this *Doe vs. Mercy* decision, which I also think is

21  helpful, the Third Circuit, is they discuss *Lakoski*, the

22  Texas -- the decision that came out of Texas.  And what's

23  interesting about that decision is -- let me just find that --

24  is in *Lakoski* the Court said Title VII is the exclusive remedy

25  for employment discrimination.  *Johnson* was decided before

1  *Lakoski*.  The Supreme Court already said, The legislative

2  history of Title VII says it's not the exclusive remedy.  We

3  don't care that it has an administrative component.  But in

4  *Lakoski*, that was the reasoning that the Court used.

5          The Court never mentions *Johnson*.  They also don't

6  mention *Brown*, the other case where the Supreme Court said, we

7  are saying that the amendment to -- the amendment to Title VII,

8  which deals with federal employees, that's a different

9  situation.  Because it was a waiver of sovereign immunity,

10  Johnson is the correct ruling for private action.

11          So in the Third Circuit, *Doe vs. Murphy* covers the

12  *Lakoski* decision, said, We're not persuaded by it, because they

13  don't even mention these decisions.

14          So in all of these Connecticut District Court

15  decisions, Your Honor, no one talks about, that I saw --

16  everybody just says*, Oh, Lakoski*.  Okay.  That's it.

17          The two decisions that the defendants say, well, these

18  decisions were in 2017, the two District Court decisions, those

19  two decisions, *Philpott vs. State of New York*, 2017, Your

20  Honor, there's no analysis whatsoever.  It's one brief

21  paragraph by the Court.  There's no mention of any of the

22  relevant Supreme Court cases.  All they do is cite *Lakoski* and

23  a district court decision.  There's no -- I mean, the paragraph

24  is, literally, like four or five sentences long.

25          And then the other case that they mention in 2017, the

1   *UR* case, that's another case without any analysis.  Again, it's

2   one paragraph.  They cite to a Connecticut District Court

3   decision.  There's no analysis.  There's no reference to the

4   legislative history.  There's no reference to *Johnson* or any --

5   any of these other rulings.

6          So I don't think the Court can rely on them because it

7   appears that no one brought these arguments to the Court or,

8   for some reason, the Court didn't address them.  So those are

9   the two 2017 cases that have a short analysis.

10          THE COURT:  Do you agree with me that -- well, let me

11   withdraw that.

12          If I agree with you and recognize a cause of action

13   under Title IX under these circumstances, that would be

14   deciding that people who work for federally funded educational

15   programs have greater rights than those who have only rights

16   under Title VII.  And is there anything in the legislative

17   history that says that this group of employees somehow should

18   have greater rights?

19          MS. KAPADIA:  Well, there is.  Let me find -- in the

20   Second Circuit decision, the *North Haven-Hufstedler* case --

21          THE COURT:  Mm-hmm.

22          MS. KAPADIA:  -- when the Court talks about the

23   legislative history, there are quotations in here, particularly

24   from Senator Bayh, about the problem in -- I guess when the Act

25   was passed, that female employees in academia were

1  significantly underrepresented and that intervention was
2  required in these particular institutions.  Let me see if I can
3  find some of the quotations, Your Honor.
4          So when Senator Bayh talked about the -- "As the
5  Senator knows, we're dealing with three basically different
6  types of discrimination here.  We're dealing with
7  discrimination in admission, discrimination of available
8  services, and discrimination in employment within an
9  institution, as a member of a faculty or whatever."
10         There's a section in here where he specifically refers
11  to women being underrepresented.  And I don't have it
12  highlighted, Your Honor, but I could find it.  "The impact of
13  this amendment is enormous.  It would exempt those areas of
14  traditional discrimination against women that were the reason
15  for the congressional enactment of Title IX."
16         One of the things that this Court discussed, which I
17  want to make sure that I bring to the Court's attention, is
18  after Title IX was passed and the issue of employment and
19  employment claims began to be brought, there were two or three
20  attempts to amend Title IX to remove employment discrimination.
21  They didn't pass.  Title VI, on the other hand, an amendment
22  passed, where that removed employment discrimination.  And
23  that's one of the other things that I think is particularly
24  significant in terms of the way the Second Circuit sees this.
25         One other -- I'm sorry, Your Honor.  Did you have --

1          THE COURT:  No.

2          MS. KAPADIA:  Oh, okay.

3          One other thing that I wanted to bring to the Court's

4    attention is I think that, when we did the telephonic

5    conference, Your Honor asked me if the amended complaint

6    changed this analysis.  And I said no because I thought it was

7    strictly a legal issue.

8          But I think there is something that -- that is

9    different, in that in the amendment we put forth facts where --

10   the facts are that my client went to the Office of Equity and

11   Diversity, which is Wesleyan's Title IX office.  She said to

12   them, you know, there is gender bias in teaching and these --

13   using these student teaching evaluations, that this is a

14   process that is unique to educational institutions.

15         In the amended complaint, we allege that the head of

16   this department told Plaintiff that they had been given new

17   directives from the Department of Education under Title IX that

18   they had concerns about gender bias and that this is a real

19   thing.  And I think I quote that in my amended complaint.

20         In response -- and we say this in the amended

21   complaint, too -- the Title IX office said, We are not going to

22   do a deep dive into institutional policy.  What we looked at is

23   the general hostile nature of the situation in the physics

24   department.

25         That is addressed in the complaint.  That affected

1  female students and female faculty.  So the amended complaint

2  now —— now, she wasn't going to the office.  They turned it

3  into a broader complaint.  They didn't want to address the

4  student teaching evaluations.  They said, Well, we just looked

5  at the general hostile situation in the physics department.

6          And in the beginning of the complaint, in the amended

7  complaint, I went through, in detail, that female students

8  complained.  They had to fire a TA because of the way he spoke

9  to a female student.  You know, they were —— there were all

10 kinds of things that happened to them.

11         So this situation —— so I think I misspoke.  And it

12 was really in reviewing, preparing for this argument, when I

13 went through the amended complaint and said, Wait a minute.  It

14 is a little bit different that if someone feels there is a

15 Title —— now, my client went forward thinking there was a Title

16 IX violation.  And she was led to believe that by the head of

17 the Office of Diversity and Equity.  And then he referred her

18 to Debbie Colucci, his subordinate, and said, Go talk to her

19 and have her look into this.

20         So if a faculty member is raising an issue under Title

21 IX, and they can't be protected, then they're subjected to

22 retaliation, and they have no remedy under Title IX.  That

23 would be inconsistent with any employment statute I've ever

24 read.

25         THE COURT:  Well, except that this —— the claim that

1      you just outlined there --

2              MS. KAPADIA:  Yes.

3              THE COURT:  -- is much more aligned with the *Jackson*

4      case, that your client brought a Title IX concern vis-à-vis

5      these -- evaluation process --

6              MS. KAPADIA:  Well --

7              THE COURT:  -- and was retaliated against for that.

8      That's different than employment discrimination.

9              MS. KAPADIA:  No.  Let me explain, Your Honor.

10             That -- the issue about the student teaching

11     evaluations is that there is a whole science that has developed

12     that says that student teaching evaluations adversely affect

13     women in higher learning fields.  For some reason -- I mean,

14     they even have studies where they have a online class, and they

15     have a male teacher's name; and they have the exact same course

16     material, exact same deadlines, exact same syllabus,

17     everything.  And all they -- they get glowing -- you know,

18     everything's great.  Then they change the name to a female

19     name, and then all of a sudden these personal -- like, things

20     start to --

21             THE COURT:  Understood.

22             MS. KAPADIA:  So my --

23             THE COURT:  What is the claim -- you started by

24     saying, I think, the amended complaint changes the --

25             MS. KAPADIA:  Right.

```
 1              THE COURT:  -- the issue a little bit.

 2              MS. KAPADIA:  Because --

 3              THE COURT:  So why -- as I read through the briefs,

 4    there was a -- I mean, everybody was sort of arguing with the

 5    supposition that the Title IX claims and the Title VII claims

 6    are, essentially, identical.  And I think you're telling me

 7    that you don't think that they are.

 8              MS. KAPADIA:  Well, I don't think they're identical in

 9    the sense that the remedies are different.

10              THE COURT:  Right.  Remedies aside.

11              MS. KAPADIA:  Okay.

12              THE COURT:  The conduct that Wesleyan engaged in, are

13    you saying -- and it may just be that I'm not following.  Are

14    you saying that Wesleyan's conduct in violating Title IX is

15    different than its conduct in violating Title VII?

16              MS. KAPADIA:  I'm saying that -- so when my client

17    went to the Office of Diversity and Equity, she was making a

18    claim for a discriminatory impact by the -- the way that

19    Wesleyan used student teaching evaluations in evaluating

20    faculty.

21              THE COURT:  Okay.

22              MS. KAPADIA:  So that was the issue.

23              The Office of Diversity and Equity said -- because

24    there had been earlier issues with the hostility in the physics

25    department, they didn't want to address this student teaching
```

UNITED STATES DISTRICT COURT

1  evaluation problem.  So they said, We are looking at the

2  general -- we did an investigation on the general hostility in

3  the physics department.  There was a history of female

4  students, female faculty and -- you know....

5          And so my -- what I'm trying to say is the

6  distinguishing thing here is the complaint that my client made,

7  her intention was to address one thing.  It actually ended up

8  being interpreted as a general hostility toward women in the

9  physics department.  She did raise those issues throughout her

10 employment.  Those affected teachers and students.

11         So my point is that in this situation, the complaint

12 that she made ended up being a gender complaint, and it ended

13 up -- the investigation ended up involving student and teacher

14 impact in the physics department.  So what I'm saying is that

15 her -- the protected conduct involved employment discrimination

16 and hostility toward students, female students, and female

17 faculty.

18         So when I said that I didn't think the amended

19 complaint made a difference, I think that it did make a

20 difference.  But, you know, I don't know that that is a huge

21 point, Your Honor.  I think that the case law -- based on the

22 cases, I think it's not difficult for the Court to say that the

23 Title IX claim stands because *Lakoski* did not address *Johnson*,

24 did not -- goes completely against what the Supreme Court said.

25         And then the second thing is the amended complaint

1  does change things a little bit in the sense that she didn't

2  just go to Title -- she actually went to the Title IX office.

3  She was led to believe that this student teaching evaluation

4  situation was a Title IX problem.  And then, in the context of

5  that, they ended up broadening it or narrowing it, depending on

6  how you look at it, to general hostility in the physics

7  department because they didn't want to take on the issue of the

8  student teaching evaluations.

9          So I don't know if I clarified it, Your Honor.

10          THE COURT:  You did.  Okay.

11          MS. KAPADIA:  And I think I may have one more point.

12          Unless the Court has any other questions, Your Honor,

13  I don't --

14          THE COURT:  No.

15          MS. KAPADIA:  Thank you.

16          THE COURT:  Thank you.

17          Mr. Curtin, do you wish to respond?

18          MR. CURTIN:  Yes, Your Honor.  I'll try to be brief.

19          I'm not going to respond to all of that, but I will

20  say I think that Plaintiff's counsel makes a good point in that

21  the damages are different between Title IX and Title VII.  And

22  the fact that there are substantial differences between the

23  remedial scheme of Title VII, which was enacted before Title

24  IX, and Title IX's remedial scheme indicates that Congress did

25  not mean to displace the remedial scheme for employment

1  discrimination claims concerning gender by enacting Title IX.

2        All of the legislative history that was discussed in

3  the context of the *North Haven* case was addressed at whether or

4  not the Department of Education, formerly the Department of

5  Health, Education and Welfare, had the authority to implement

6  regulations to address employment discrimination.  And I'll

7  concede that, yes, it did.  And in the context of implementing

8  those decisions, Congress was exercising the power of the purse

9  to revoke federal funding if there was a complaint to the OCR

10  that substantiated employment discrimination.

11        But nothing in *North Haven* and the other -- the Second

12  Circuit decision or the Supreme Court decision indicated that

13  that would also apply to a private cause of action in the

14  context of employment discrimination.  In fact, the case law

15  that has developed since the *North Haven* cases has made very

16  clear that Congress was, in effect, saying that individual

17  employees may exercise their rights under either Title VII or

18  the Equal Pay Act, but that the Department of Education may use

19  its powers to threaten to withdraw federal funds or actually

20  withdraw them from federally assisted educational institutions,

21  if necessary, when such a recipient practices discrimination on

22  the basis of sex.

23        I don't have any dispute over whether *North Haven* was

24  properly decided because it does not touch upon a private cause

25  of action in the context of Title IX employment discrimination.

1  It, instead, touches upon whether or not Congress -- whether or

2  not the Department of Education had the ability to implement

3  regulations that touched upon employment discrimination.  It

4  did.  It's two separate issues, and it doesn't have any bearing

5  on this Court's decision here today.

6          Now, I'd like to point out one thing that I think is

7  important.  In the *Jackson* case there's a vigorous dissent by

8  Justice Thomas.  And I would ask the Court to review that, if

9  it has not already, because I think it is instructive on how

10  today the Supreme Court would rule on this particular issue.

11          Justice Thomas took a -- I wouldn't even say

12  skeptical, but a scathing review of Justice O'Connor's

13  decision, saying that they were basically -- that the Supreme

14  Court, in a 5-4 decision -- it was not a majority -- it was not

15  an unanimous decision; it was a split decision -- that the

16  majority was implementing judicial gloss on Title IX where

17  there was no evidence that Congress had intended for there to

18  even be a private cause of action for retaliation.

19          Justice Thomas made very clear that "the Court has

20  repeatedly held that the obligations Congress imposes on states

21  and spending power legislation must be clear.  Such legislation

22  is in the nature of a contract, and funding recipients'

23  acceptance of the terms of that contract must be voluntary and

24  knowing."

25          As we all know by reading Title IX, it does not say

1    anything about employment discrimination.  It is vague and

2    doesn't even -- it doesn't even include a private cause of

3    action.  Now, that's been decided, but there's still very much

4    a circuit split as to whether there is an employment cause of

5    action.

6        *Jackson* didn't discuss that.  Didn't even reference

7    it.  All it did was discuss the associational discrimination

8    claim that the girls' basketball coach in that particular

9    instance had brought.  Since then, Jackson is still good law,

10   but it doesn't do anything in the context of private causes of

11   action concerning employment discrimination or retaliation.

12       *Doe vs. Mercy*.  The reliance on the *Johnson* case, I

13   don't see how that has any bearing.  1983 was enacted in 1866,

14   many decades before Title VII was enacted in 1964.  Congress

15   was fully aware of the effect of Section 1983 when it enacted

16   Title VII.  And if it had meant to displace Section 1983, I

17   imagine it would have done so when it enacted Title VII in 1964

18   and then again amended it in -- amended Title VII again in 1991

19   to provide for monetary damages and compensatory damages and

20   punitive damages.

21       Again, it -- I think that if the Court were here to

22   adopt the minority view in this district, that Title IX

23   provides a private right of action for employment

24   discrimination.  It would be providing -- it would be making a

25   cause of action out of what Justice Thomas called, in his

1  dissent, "whole cloth."  It would be putting judicial gloss on

2  a statute when Congress had no intention of providing the

3  private right of action for employment discrimination in the

4  context of gender discrimination or retaliation.

5          The damages limitations on -- if the Court were to

6  adopt the minority view, it would be saying that the caps

7  placed on compensatory and punitive damages in Title VII are

8  not in play for employees at federally funded educational

9  institutions.  I have not found any indicia in any case that

10 Congress intended for those federal -- those employees of

11 federally funded educational institutions to be able to bypass

12 the caps on compensatory and punitive damages.  Moreover, I

13 haven't found any indicia that Congress intended for such

14 employees to be able to work around the exhaustion requirements

15 in Title VII.

16         I simply -- I think that *Doe vs. Mercy* was wrongly

17 decided.  I think it misconstrues the holding of *Jackson*

18 completely.  And I'd urge the Court to disregard it and,

19 instead, adopt the majority view in this district, which I

20 think, if it goes up to the Second Circuit and ultimately the

21 Supreme Court, it will be the Supreme Court's view, which is

22 there is no private right of action under Title IX for gender

23 discrimination in the employment relationship context.

24         The last thing that I will note is to address these

25 new facts.  It does not seem the plaintiff even knows what her

UNITED STATES DISTRICT COURT

1  own claim is at this point.  I think that that impresses upon

2  everybody why it's important that we be able to depose

3  Plaintiff.  We've been attempting to depose Plaintiff for

4  months, and we have not been able to.  We would very much like

5  to depose Plaintiff to find out what her claims are.  It seems

6  that now there is a new claim that nobody read into this before

7  today.

8          Again, though, in the very narrow manner that

9  Plaintiff's counsel defined this new factual scenario, the

10 allegation is that the plaintiff complained to the Title IX

11 department about how student evaluations adversely affected her

12 individual employment.  And she believes -- she speculates that

13 somehow the Title IX department instigated a larger

14 investigation that may have encompassed other matters.

15         I don't think that that's well-articulated in the

16 complaint.  I don't even think, looking at the allegations in

17 the complaint in the light most favorable to the plaintiff,

18 that you can read that allegation.  But even if true, again,

19 plaintiff is merely articulating a complaint about her own

20 individual employment circumstances.  That was her individual,

21 discrete concern as articulated by counsel here today; and to

22 that extent, it does not change the fact that this is a narrow

23 legal argument about whether or not Title IX implies a private

24 right of action for gender discrimination in the context of the

25 employment relationship.

```
 1              THE COURT:  All right.  Thank you.
 2         All right.  Well, I will say I'm going to reserve on
 3   the issue.  I see that the discovery disputes are in briefing.
 4   I don't generally schedule oral argument on discovery disputes.
 5   I just usually wait until everything that needs to be put in
 6   writing is in writing, and then I review it and issue
 7   decisions.
 8         I saw that Wesleyan has filed a motion to compel, to
 9   which Plaintiff needs to respond; and I think the other
10   discovery dispute is just fully briefed.  So I'll get a ruling
11   out on that, hopefully, shortly.
12         Anything else we can do here this morning?
13         MS. KAPADIA:  Yes.  Your Honor, can I just make just a
14   couple of comments about the amended complaint?  I just want to
15   direct the Court's attention to paragraph 80 and paragraph 82
16   of the amended complaint, which referred to the manner in which
17   Ms. Colucci, the Office of Diversity, and in that she said,
18   "This is generally regarding the culture of the physics
19   department," and then in 82 where she says, "We're not going to
20   do a deep dive into institutional policy and procedure."  So
21   this is consistent with what I just described.
22         Your Honor, I just want to make sure that this record
23   is clear.  I am concerned that a motion to compel was filed by
24   Defendant, and I'm concerned about the comment here that, "We
25   haven't been able to depose Plaintiff."  I'm going to
```

1 address --

2      THE COURT:  I'm not -- I'm not -- I'm not -- I wasn't

3 asked to do anything with that commentary.  If you'd like to

4 respond to the commentary, that's fine, but I am not having a

5 discovery argument.

6      MS. KAPADIA:  I -- okay.

7      THE COURT:  But if you want to make a record

8 because -- that's fine.

9      MS. KAPADIA:  Okay.  So we had a meet-and-confer.  We

10 had the conference call with the Court on February 4th.  We

11 had a meet-and-confer on February 7th, and it was agreed that

12 Plaintiff would be deposed in May, after her academic year

13 ended.  They agreed to that.  They said they wanted to depose

14 her husband and said, do you want to fly out there or should we

15 -- do you want to do her here or there?  We talked about all of

16 that.

17      In the e-mail that they provided to the Court, I asked

18 them, If you have specific dates in mind for May, let me know.

19 No one has followed up.  So I don't know why a comment would be

20 made that, "We haven't been able to depose plaintiff" when

21 we've already reached agreement on when that would occur.

22      Secondly, we had the meet-and-confer on the 7th.

23 The Court had ordered that we do that with respect to the

24 initial disclosures.  I said I would also address any concerns

25 that opposing counsel had with respect to plaintiff's

1   discovery, because they said they had concerns.

2          So we had the meet-and-confer.  And I told the Court

3   during the telephonic conference, too, that I was away in

4   February.  One of my kids is in high school so -- you know,

5   they -- in February, and the other one has a March vacation.

6   So that part, end of February, beginning of March, I was away.

7   So I said, when I come back, I will address these issues.

8          On March 4th we sent a supplemental compliance,

9   giving them tax returns.  I have e-mail correspondence with the

10  doctor's office from last week saying, Where are the records

11  you're supposed to send us?  I brought --

12         THE COURT:  Counsel, do you really think this is the

13  necessary record in response to a single comment that they

14  haven't been able to depose the plaintiff?

15         MS. KAPADIA:  No.  The reason I'm making this record,

16  Your Honor, is I would like this motion to compel to be

17  withdrawn because even --

18         THE COURT:  Well, then have that conversation with

19  him.  I'm not going to order them to withdraw a motion to

20  compel and -- so have that discussion.  And if they don't

21  agree, then, obviously, you're going to file your response,

22  which will likely, I assume, include most of what you've just

23  told the Court.

24         Both of you are experienced litigators in this area of

25  the law, so I don't understand why these issues keep arising.

1  It's not going to be difficult to predict what it is I'm going

2  to require on both sides in terms of discovery, but it's not

3  something that I'm -- I haven't even read their motion to

4  compel yet, so I -- it just came in, I think.

5           So either work it out or brief it, and I'll get you a

6  decision.  And I don't mean to cut you off, but I'm just not

7  sure anything is going to be advanced by airing, at this

8  juncture and in this forum, ongoing difficulties that two sides

9  have communicating and agreeing.

10           Is there anything else we can do this morning?

11           MS. KAPADIA:  I don't think so, Your Honor.

12           THE COURT:  Okay.

13           MS. KAPADIA:  I don't think so.

14           THE COURT:  All right.

15           MR. CURTIN:  No, Your Honor.  Thank you for your time.

16           THE COURT:  All right.  We're in recess.

17           COURTROOM DEPUTY:  All rise.  The Honorable United

18  States District Court now stands in recess.

19           [Proceedings concluded at 11:19 a.m.]

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

```
 1                    REPORTER'S CERTIFICATE

 2

 3           I, Traci D. Walker, Official Court Reporter for

 4    the United States District Court for the District of

 5    Connecticut, with offices at Bridgeport, do hereby certify:

 6           That I reported on the Stenograph machine the

 7    proceedings held in open court on March 18, 2019, in the matter

 8    of OTHON VS. WESLEYAN UNIVERSITY, CASE NUMBER: 3:18-CV-00958;

 9    that said proceedings in connection with the hearing were

10    reduced to typewritten form by me; and that the foregoing

11    transcript (Pages 1-30) is a true and accurate record of the

12    proceedings.

13           This 26th day of April, 2019.

14

15

16

17                   _____

18                   /s/ Traci D. Walker, RMR-CRR-CRC
                     Official Court Reporter
19

20

21

22

23

24

25
```