## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| CHRISTINA OTHON | ) | 3:18-CV-00958 (KAD) |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| WESLEYAN UNIVERSITY | ) | |
| *Defendant.* | ) | MARCH 27, 2020 |

## MEMORANDUM OF DECISION
## RE: MOTION TO DISMISS

Kari A. Dooley, United States District Judge

Through this action, Christina Othon ("Othon"), a former associate professor at Wesleyan University ("Wesleyan"), challenges the denial of her application for tenure and her subsequent termination. Pending before the Court is Wesleyan's motion to dismiss Counts Three and Four of the Amended Complaint, which assert claims for sex-based discrimination and retaliation under Title IX of the Education Amendments Act of 1972, 20 U.S.C. § 1681 *et seq.* ("Title IX"). (ECF No. 59.) Wesleyan contends that Title IX affords no private remedy for employment discrimination claims and, therefore, these counts fail to state a claim upon which relief can be granted. For the reasons set forth below, the Court agrees with Wesleyan and the motion to dismiss is therefore GRANTED.

## Background[1]

In July 2010, Othon began working as an associate professor in the Physics Department at Wesleyan. During the course of her employment, Othon experienced and observed a variety of sex-based discrimination. For example, Othon "faced combative and occasionally hostile treatment within the classroom from male students." (Amended Compl. at ¶ 28, ECF 57.) These

---

[1] For purposes of resolving the motion to dismiss, the Court accepts the allegations in the complaint as true.

students further provided negative teaching evaluations "which often were overtly biased and inaccurately portrayed what had actually occurred in class." (*Id.* at ¶ 30.) Notwithstanding this and other challenges, Othon continued to pursue a tenured teaching position at Wesleyan.

During her third year review, "the Advisory Committee, relying solely on the gender biased teaching evaluations, gave [Othon] an unfavorable evaluation." (*Id.* at ¶ 38.) The Advisory Committee further gave Othon only a two-year reappointment that was contingent upon strong student evaluations, which was an "unusual" decision and inconsistent with Wesleyan's policies and procedures. (*Id.* at ¶ 39.) In the fall of 2015, Othon underwent her fifth year review, after which the Advisory Committee "issued a decision essentially terminating [Othon's] contract with [Wesleyan] and striking her ability to apply for tenure." (*Id.* at ¶ 56.) The Advisory Committee again stated that its decision was based on Othon's teaching evaluations. (*Id.*) That decision was subsequently overturned, but the Advisory Committee stated that "going forward the teaching evaluations would continue to be 'central' to its decision in the teaching category" of Othon's tenure review. (*Id.* at ¶ 65.)

In June of 2016, Othon filed a sex-discrimination complaint with Wesleyan's Office of Diversity and Equity. (*Id.* at ¶ 70.) "[Othon] asked the Office of Diversity and Equity to address the dependence on student evaluations in faculty assessments because of the gender bias that permeates them and the impact they had on her in the third and fifth year review process." (*Id.*) On November 15, 2016, Othon was informed that the investigation into her complaint was complete and no further action was taken. (*Id.* at ¶¶ 79–81.) Three months later, on February 21, 2017, Othon learned that her tenure application had not been approved. (*Id.* at ¶¶ 100, 103–04.) Othon accuses the chair of the Physics Department of responding poorly to her Title IX claim and hindering her tenure application efforts. (*Id.* at ¶¶ 76–77, 87–99.) Othon also contends that

Wesleyan engaged in other retaliatory conduct after her tenure application was not approved. (*Id.* at ¶¶ 128–137.)

Othon instituted this action on June 6, 2018. The operative complaint is the Amended Complaint. (ECF No. 57.) As relevant to the motion to dismiss, Othon asserts claims under both Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, ("Title VII") and Title IX. In Counts One and Three, respectively, she asserts claims for discrimination on the basis of sex and hostile work environment in violation of Title VII and Title IX. In Counts Two and Four, respectively, she asserts claims for retaliation in violation of Title VII and Title IX.[2]

**Standard of Review**

The standard of review for motions to dismiss is well settled. To survive a motion to dismiss filed pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. This case is unique in that it involves a purely legal question. That is, whether Title IX has an implied private right of action for employment discrimination claims. A motion made under Rule 12(b)(6) is the appropriate vehicle for testing the "legal feasibility" of such a cause of action. *Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities Inc.*, 748 F.2d 774, 779 (2d Cir. 1984).

---

[2] In Count Four, Othon alleges only that Wesleyan "retaliated against [her] for expressing opposition to discriminatory conduct based on her sex and raising concerns regarding noncompliance with Title IX requirements." (Amended Compl., Count Three, at ¶ 138.) In her post-hearing opposition brief, however, Othon suggests that she could have a viable Title IX claim based on her allegation that the Office of Diversity and Equity at Wesleyan misunderstood her Title IX complaint to be about the culture of the Physics Department and its impact on female students. This theory of liability does not fall within the scope of Count Four as currently pleaded, and the Court takes no position of the viability of such a claim.

**Discussion**

Title IX provides in pertinent part:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance. . . .

20 U.S.C. § 1681(a). Title IX contains a federal administrative enforcement provision, which authorizes the Department of Education to terminate or refuse to grant financial assistance to any program or activity that fails to comply with Title IX. 28 U.S.C. § 1682. Title IX does not expressly provide for a private right of action.

Nonetheless, it is well settled that Title IX includes an implied private right of action. *Cannon v. Univ. of Chicago*, 441 U.S. 677, 717 (1979). The question before the Court is scope of that implied remedy. Othon contends that Title IX affords a private remedy for employment discrimination claims, while Wesleyan contends that it does not. Neither the United States Supreme Court nor the Second Circuit Court of Appeals have addressed this issue, and the Circuit Court of Appeals and district courts that have are divided. The courts that have addressed this issue consistently look to the legislative history of Title IX and Title VII, Supreme Court precedent interpreting or discussing Title IX, and Supreme Court precedent discussing the scope and impact of Title VII. In this Court's view, the resolution of the issue presented here is found at the intersection of these authorities.

### Legislative History of Title IX and Title VII

In the 1960s, Congress passed a series of laws aimed at ending employment discrimination and discrimination in federally funded programs. But many of these laws did not adequately address sex-based employment discrimination, particularly in the educational system. *See N. Haven Bd. of Ed. v. Bell*, 456 U.S. 512, 523 & n.13 (1982) (summarizing history of Title IX)

[hereinafter "*Bell*"]. For instance, although Title VII prohibited employment discrimination on the basis of sex, it contained an exemption for educational institutions. Pub. L. 88-352, Title VII, § 702, 78 Stat. 255 ("This act shall not apply . . . to an educational institution with respect to the employment of individuals to perform work connected with the educational activities of such institution."). Similarly, the Equal Pay Act of 1963 banned discrimination in wages on the basis of sex, but it exempted "any employee employed in a bona fide executive, administrative, or professional capacity (including any employee employed in the capacity of academic administrative personnel or teacher in elementary or secondary schools)." 29 U.S.C. § 213(a)(1). Lastly, Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, *et seq.*, ("Title VI") while barring discrimination on the basis of "race, color, or national origin" in federally funded programs and activities, did not bar discrimination on the basis of sex. 42 U.S.C. § 2000d.

In 1972, Congress passed the Equal Employment Opportunity Act of 1972 ("1972 Amendments"), which removed most of Title VII's exemption for educational institutions, making them subject to Title VII's prohibitions, regardless of whether they receive federal funding.[3] *Lakoski v. James*, 66 F.3d 751, 757 (5th Cir. 1995). That same year, "the provisions ultimately enacted as Title IX were introduced in the Senate by Senator Bayh during debate on the Education Amendments of 1972" (the "Education Amendments"). *Bell*, 456 U.S. at 524 (footnote omitted). As explained by Senator Bayh, his proposed amendment "basically . . . closes loopholes in existing legislation relating to general education programs and employment resulting from those programs." *Id.* (quoting 188 Cong. Rec. 5803(1972)). "In addition to prohibiting gender discrimination in federally funded education programs and threatening termination of federal

---

[3] Title VII continues to have a limited exemption for religious educational institutions with respect to the employment of individuals of a particular religion. 42 U.S.C. § 2000e-1(a).

assistance for noncompliance, the [proposed] amendment included provisions extending the coverage of Title VII and the Equal Pay Act to educational institutions." *Bell*, 456 U.S. at 524.

Eventually, in fact three months after passing the 1972 Amendments which removed Title VII's exemption for educational institutions, Congress passed the Education Amendments, to include Title IX. In addition to enacting Title IX, the Education Amendments amended the Equal Pay Act so that its minimum wage requirements applied to employees working in an executive, administrative, and professional capacity. Title VI, § 906, 86 Stat. 375; *see also* 29 U.S.C. § 213(a). And, because they were no longer necessary in light of the 1972 Amendments, the provisions regarding Title VII were removed from the Education Amendments prior to its passage. *Bell*, 456 U.S. at 529 n.18.

### Supreme Court Precedent Interpreting Title IX

Shortly after the enactment of Title IX, litigation as to its scope began. One of the first issues raised was whether Title IX contains an implied private right of action. In *Cannon v. University of Chicago*, 441 U.S. 677 (1979), the Supreme Court, applying the factors set forth in *Cort v. Ash*, 422 U.S. 66 (1975),[4] concluded that it did. As relevant to the instant discussion, the Supreme Court determined that Title IX's legislative history indicated that Congress expected courts to recognize an implied private right of action, as federal courts had previously construed similar remedial statutes to have an implied private right of action. *Id.* at 694–703. For example, Title VI, on which Title IX was patterned, had been construed by several federal courts to include an implied private right of action. *Id.* at 696–97. The Supreme Court had also interpreted

---

[4] "In determining whether a private remedy is implicit in a statute not expressly providing one, several factors are relevant. First, is the plaintiff one of the class for whose especial benefit the statute was enacted—that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?" *Cort*, 422 U.S. at 78 (citations omitted; internal quotation marks omitted).

comparable language in the Voting Rights Act of 1965, 42 U.S.C. § 1973 *et seq*., as authorizing

an implied private remedy. *Id.* at 698–99; *Allen v. State Bd. of Elections*, 393 U.S. 544, 557 (1969).

Given the "unusually important" nature of these precedents, the Supreme Court concluded that it

was "not only appropriate but also realistic to presume that Congress was thoroughly familiar with

[them] . . . and that it expected [Title IX] to be interpreted in conformity with them." *Id.* at 699.

The Supreme Court further determined that recognizing a private right of action would not frustrate

the purpose of Title IX. *Id.* at 703–08. On the contrary, the Department of Health, Education, and

Welfare ("HEW"), which preceded the Department of Education, took "the unequivocal position

that the individual remedy will provide effective assistance to achieving the statutory purposes,"

admitting that "it does not have the resources necessary to enforce Title IX in a substantial number

of circumstances." *Id.* at 706–08 & n.42.

Since *Cannon*, the Supreme Court has continued to sculpt the parameters of Title IX's

private remedy. In *Franklin v. Gwinnett County Public Schools*, 503 U.S. 60, 76 (1992), the

Supreme Court held that monetary damages are available in private suits brought under Title IX.

More recently, in *Jackson v. Birmingham Board of Education*, 544 U.S. 167 (2005), the Supreme

Court held that retaliation was a form of gender discrimination within the meaning of Title IX. *Id.*

at 171. In that case, the plaintiff was removed from his position as the girls' basketball coach after

complaining to his supervisors about the disparate treatment his team received. *Id.* at 171–72. He

subsequently filed suit under Title IX, and the defendant moved to dismiss, arguing that Title IX's

private remedy did not encompass retaliation claims. *Id*. at 172. The district court and Eleventh

Circuit agreed with the defendant, but the Supreme Court reversed. *Id.* at 171. The Supreme Court

reasoned that retaliation "is a form of 'discrimination' because the complainant is being subjected

to differential treatment. Moreover, retaliation is discrimination 'on the basis of sex' because it is

an intentional response to the nature of the complaint: an allegation of sex discrimination." *Id.* at 174 (citations omitted). Therefore, retaliation claims fell within the scope of Title IX's private remedy.

The Supreme Court has also weighed in on HEW's regulatory authority under Title IX. In 1975, HEW "invoked its . . . authority to issue regulations governing the operation of federally funded education programs. . . . Interpreting the term 'person' in [Title IX] to encompass employees as well as students, HEW included among the regulations a series entitled 'Subpart E,' which deals with employment practices, ranging from job classifications to pregnancy leave." *Bell*, 456 U.S. at 515–16 (footnotes omitted). Subpart E was the subject of much controversy, and a split emerged among the Circuit Court of Appeals concerning whether HEW had authority to issue regulations prohibiting sex discrimination in employment. *Id.* at 519–20.

The Supreme Court addressed this Circuit split in *New Haven Board of Education v. Bell*, 456 U.S. 512 (1982) and held that HEW had the authority to issue Subpart E. *Id.* at 530. The court noted that Title IX contained a "broad directive" that "no person" be discriminated against on the basis of sex. *Id.* at 520. Employees, like students, are capable of being "excluded from participation in" or "denied the benefits of" education programs receiving federal financial support. *Id.* (internal quotation marks omitted). In addition, the statements of Senator Bayh, the amendment's sponsor, during the debate indicated that he and the Senate understood that Title IX would cover employment practices. *Id.* at 524–27. The House of Representatives acceptance of the Senate's omission of an amendment that would have carved employment discrimination out of Title IX was viewed as further evidence that Congress intended to prohibit sex discrimination in employment. *Id.* at 528. Finally, the Supreme Court noted that Congress was aware of HEW's interpretation of Title IX to encompass employment discrimination, and the controversy

8

surrounding Subpart E, but had rejected legislation that would have amended Title IX to limit its coverage of employment discrimination. *Id.* at 531–35. This was significant because Congress had amended Title IX to address other regulations with which it disagreed. *Id.* at 534. All of these factors, the court concluded, weighed in favor of recognizing HEW's authority to issue regulations on employment discrimination.

### Supreme Court Precedent Interpreting Title VII

Title VII provides, in pertinent part:

> It shall be an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex. . . .

42 U.S.C. § 2000e-2(a)(1). Title VII also contains an enforcement provision that subjects employment discrimination claims to "a detailed administrative and judicial process designed to provide an opportunity for nonjudicial and nonadversary resolution of claims." *Great Am. Fed. Sav. & Loan Ass'n v. Novotny*, 442 U.S. 366, 372–73 (1979) [hereinafter "*Novotny*"]; *see also* 42 U.S.C. § 2000e-5 (setting forth enforcement provisions of Title VII).

Importantly, Congress' "comprehensive plan" for Title VII includes the requirement that the complainant exhaust administrative remedies before filing suit in federal court. *Novotny*, 442 U.S. at 373. If Title IX contains a private remedy for employment discrimination, employees of federally funded educational programs or activities would be able to by-pass these mandatory administrative procedures and file a claim directly in federal court. Accordingly, courts also analyze the interplay between Title IX's implied private remedy and the scope and applicability of Title VII when determining whether Title IX affords a private right of action for employment discrimination.

The Supreme Court has previously held that statutes with comprehensive or elaborate remedial schemes foreclose alternative avenues of relief. *E.g.*, *Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 127 (2005) (holding that Telecommunications Act precluded claims under 42 U.S.C. § 1983 because allowing "[e]nforcement of [the Telecommunications Act] through § 1983 would distort the scheme of expedited judicial review and limited remedies created by [the Telecommunications Act]"); *Smith v. Robinson*, 468 U.S. 992, 1012 (1984) ("find[ing] it difficult to believe that Congress" intended to permit "handicapped child to go directly to court with an equal protection claim to a free appropriate public education" through a Section 1983 claim because of "the comprehensive nature of the procedures and guarantees set out in the [Education of the Handicapped Act] and Congress' express efforts to place on local and state educational agencies the primary responsibility for developing a plan to accommodate the needs of each individual handicapped child")[5]; *Middlesex Cnty. Sewerage Auth. v. Nat'l Sea Clammers Assn.*, 453 U.S. 1, 20–21 (1981) (holding that plaintiffs cannot use Section 1983 as a vehicle for redressing claims under the Federal Water Pollution Control Act and Marine Protection, Research, and Sanctuaries Act of 1972 because these statutes were sufficiently comprehensive to demonstrate Congressional intent to preclude suit under Section 1983); *see also Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 252–55 (2009) (reviewing and analyzing this precedent).

Title VII, on the other hand, "was designed to supplement rather than supplant, existing laws and institutions relating to employment discrimination," and "the legislative history of Title VII manifests a congressional intent to allow an individual to pursue independently his rights under both Title VII and other applicable state and federal statutes." *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 48–49 (1974). As a result, the Supreme Court has permitted claimants to pursue

---

[5] *superseded by statute as stated in Fry v. Napoleon Cmty. Sch.*, 137 S. Ct. 743 (2017).

claims under both Title VII and civil rights statutes existing at the time Title VII was passed. For example, in *Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454 (1975), the Supreme Court held that Title VII does not foreclose claims brought under 42 U.S.C. § 1981. *Id.* at 461. In doing so, the Supreme Court noted that Congress had specifically indicated that Title VII would be co-extensive with Section 1981 and "that the two procedures augment each other and are not mutually exclusive." *Id.* at 459 (quoting H.R. Rep. No. 92–238, p.19 (1971)).[6]

There are some cases, however, in which the Supreme Court and the Second Circuit have declined to recognize co-extensive rights. In *Brown v. General Services Administration*, 425 U.S. 820 (1976), the Supreme Court held that federal employees could not bring employment discrimination claims under Section 1981 because it concluded that Title VII provides the exclusive remedy for employment discrimination claims made by federal employees. *Id.* at 835. The court distinguished *Johnson* in two respects. First, it noted that "there were no problems of sovereign immunity in the context of the Johnson case." *Id.* at 833. Second, *Johnson* relied upon the explicit legislative history of the 1964 Act which made clear that Title VII remedies are co-extensive with those available under civil rights statutes enacted in the 19th Century, including Section 1981. *Id.* at 833–34. The 1972 Amendments, which brought federal employees within the reach of Title VII, had "no such legislative history." *Id.* at 834. To the contrary, Congress believed that federal employees had no effective judicial remedy and passed the 1972 Amendments to solve that problem. *Id.* at 827–28. Lastly, the court noted that "[i]n a variety of contexts the

---

[6] Othon relies heavily on *Alexander v. Gardner-Denver Co.*, 415 U.S. 36 (1974), which held that an individual does not forfeit his claims under Title VII by utilizing the grievance procedure provided for in a collective-bargaining agreement. *Id.* at 49. *Alexander* is inapposite. Therein, the court was addressing two distinct rights; one contractual, one statutory. As the Supreme Court explained, "a contractual right to submit a claim to arbitration is not displaced simply because Congress also has provided a statutory right against discrimination. Both rights have legally independent origins and are equally available to the aggrieved employee." *Id.* at 52.

Court has held that a precisely drawn, detailed statute pre-empts more general remedies." *Id*. at 834.

Three years later, in *Great American Federal Savings & Loan Association v. Novotny*, 442 U.S. 366 (1979), the Supreme Court held that Title VII precludes employment discrimination claims brought under 42 U.S.C. § 1985(3).[7] There, the court's decision was driven by the fact that "Section 1985(3) provides no substantive rights itself; it merely provides a remedy for violation of the rights it designates." *Id*. at 372; *see also id*. at 376 ("It is a purely remedial statute, providing a civil cause of action when some otherwise defined federal right—to equal protection of the laws or equal privileges and immunities under the laws—is breached by a conspiracy in the manner defined by the section."). As a result, the Supreme Court viewed *Novotny* as differing "markedly" from those involving substantive rights in two respects. *Id*. at 377. First, in cases like *Johnson*, the court was confronted with the issue of whether substantive rights conferred in the 19th Century were withdrawn, *sub silentio*, through the subsequent passage of modern statutes, like Title VII. *Id*. The later-passed Section 1985(3) did not raise any such concerns. Second, because Section 1985(3) does not confer any "independent" rights, the court could not justify the damage that would be done to the Title VII's comprehensive and well-balanced remedial scheme by permitting a claimant to proceed immediately to federal court with a suit under Section 1985(3). *Id*. at 378.

Finally, in *Saulpaugh v. Monroe Community Hospital*, 4 F.3d 134 (2d Cir. 1993), the Second Circuit held that Title VII forecloses claims asserted under 42 U.S.C. § 1983 unless the claim is "based on substantive rights distinct from Title VII." *Id.* at 143 (quoting *Carrero v. New York City Hous. Auth.*, 890 F.2d 569, 576 (2d Cir. 1989)); *accord Day v. Wayne Cty. Bd. of Auditors*, 749 F.2d 1199, 1204 (6th Cir. 1984). After all, "[i]t would be anomalous to hold that

---

[7] Section 1985(3) proscribes conspiracies to deprive other of federally guaranteed rights and privileges.

when the only unlawful employment practice consists of the violation of a right created by Title VII, the plaintiff can by-pass all of the administrative processes of Title VII and go directly into court under § 1983." *Day*, 749 F.2d at 1204; *accord Saulpaugh*, 4 F.3d at 143 ("A plaintiff cannot use Section 1983 to gain perceived advantages not available to a Title VII claimant, *see Day*, 749 F.2d at 1204. . . .").

### Other Circuit Court of Appeals Decisions

It is against this legal backdrop that courts and parties have wrestled with the question of whether Title IX affords a private remedy for employment discrimination claims. The Third, Fifth, and Seventh Circuits have written the leading opinions on this issue.[8]

The Fifth Circuit took up this issue first in *Lakoski v. James*, 66 F.3d 751 (5th Cir. 1995) and concluded that Title VII provides the exclusive remedy for individuals seeking monetary damages[9] for sex-based employment discrimination in federally funded educational institutions.

---

[8] Othon cites decisions from the First, Fourth, and Sixth Circuits which purportedly support her position, but the analysis in each of the relevant cases is spartan or is made in the context of an issue not directly on appeal. First, in *Lipsett v. University of Puerto Rico*, 864 F.2d 881 (1st Cir. 1988), the First Circuit held that the Title VII standard for proving discriminatory treatment should apply to a medical resident's claim under Title IX that she was subjected to sex discrimination during her residency program, but the court did not separately analyze why there is a private remedy for employment discrimination claims under Title IX. *Id.* at 896–97.

Next, in *Preston v. Virginia ex rel. New River Community College*, 31 F.3d 203 (4th Cir. 1994), the Fourth Circuit cited *Bell* for the proposition that Title IX's implied private right of action "extends to employment discrimination on the basis of gender by educational institutions receiving federal funds." *Id.* at 206. But, as previously discussed, *Bell* addressed whether HEW could regulate employment practices under Title IX, not whether Title IX affords a private remedy for employment discrimination claims. *Bell*, 456 U.S. at 514. In addition, the only issue before the Fourth Circuit was whether the trial judge erred by not awarding the plaintiff damages under Title IX based on certain findings made by the jury at trial, not whether the plaintiff had a cause of action under Title IX, arguably rendering the court's statement about the existence of a private remedy *dicta*. *Preston*, 31 F.3d at 205, 208–09.

Lastly, in *Ivan v. Kent State University*, 92 F.3d 1185 (6th Cir. 1996), the Sixth Circuit proclaimed in a footnote of an unpublished *per curiam* opinion that Title VII does not preempt an individual's private remedy under Title IX. *Id.* at 1185 n.10. The Court provided no reasoning for this decision, and it is unclear whether the issue was raised and briefed by the parties. Instead, the impetus for the Sixth Circuit's pronouncement was *Wedding v. University of Toledo*, 862 F. Supp. 201, 203 (N.D. Ohio 1994), in which a different district court held that Title VII precludes a private right of action under Title IX for employment discrimination claims. *See Ivan*, 92 F.3d at 1185 n.10. *Wedding* was on appeal before the Sixth Circuit at the same time as *Ivan*, but no challenge was raised to the district court's Title IX holding. *Wedding v. Univ. of Toledo*, 89 F.3d 316, 317 (6th Cir. 1996). For these reasons, the Sixth Circuit's pronouncement in Footnote 10 is likely *dicta*.

[9] The Fifth Circuit "express[ed] no opinion [as to] whether Title VII excludes suits seeking only declaratory or injunctive relief." *Id.* at 753.

*Id.* at 753. The Fifth Circuit rejected the plaintiff's argument that, in combination, *Cannon*, *Bell*, and *Franklin* provide for "an implied private right of action for damages under Title IX for employment discrimination" because none of those cases "required the Court to address the relationship between Title VII and Title IX." *Id.* at 753–54. *Cannon* and *Franklin* involved claims by prospective or current students, while *Bell* involved a challenge to administrative regulations. *Id.* at 754. "Given the availability of a private remedy under Title VII for aggrieved employees, [the Fifth Circuit was] unwilling to follow Dr. Lakoski's beguilingly simple syllogism that *Cannon*, *Bell*, and *Franklin* all add up to an implied private right of action for damages under Title IX for employment discrimination," particularly because it "would disrupt [the] carefully balanced remedial scheme" embodied in Title VII. *Id.*

The court further concluded that "Congress intended Title VII to exclude a damage remedy under Title IX for individuals alleging employment discrimination." *Id.* at 755. The court observed that precisely drawn, detailed statutes are ordinarily viewed as preempting more general remedies, and the Supreme Court in *Novotny* had refused to permit claimants to bypass Title VII's administrative process through a claim brought under Section 1985 for this reason. *Id.* The Fifth Circuit had reached a similar conclusion with respect to Section 1983. *Id.* The court recognized that Congress could and did permit certain pre-existing remedial schemes to remain intact after the passage of Title VII. *Id.* at 755–56. But the court thought it an "extraordinary proposition" that "Congress intended to create a bypass of Title VII's administrative procedures so soon after its extension to state and local governmental employees" and its removal of the exception for educational institutions. *Id.* at 756–57. Instead, the Fifth Circuit surmised that

> in enacting Title IX, Congress chose two remedies for the same right, not two rights addressing the same problem. Title VII provided *individuals* with administrative and judicial redress for employment discrimination, while Title IX empowered *federal*

> *agencies* that provided funds to educational institutions to terminate
> that funding upon the finding of employment discrimination.

*Id.* at 757.  Accordingly, the Fifth Circuit held that there was no private remedy under Title IX for employment discrimination claims.  *Id.* at 758.

The Seventh Circuit took up this issue next in *Waid v. Merrill Area Public Schools*, 91 F.3d 857 (7th Cir. 1996).[10]  There, the Seventh Circuit reached the same conclusion as the *Lakoski* court but by a slightly different path.  The chief issue identified by the Seventh Circuit was whether Title VII, as "a comprehensive statutory scheme for protecting rights against discrimination in employment," foreclosed employment discrimination claims brought under other statutes.  *Id.* at 861–62.  Citing *Lakoski* and *Middlesex County Sewerage Authority v. National Sea Clammers Association*, 453 U.S. 1, 20–21 (1981), the Seventh Circuit concluded that it did without much independent analysis.  *Waid*, 91 F.3d at 862.

Finally, three years ago, the Third Circuit took up this issue again in *Doe v. Mercy Catholic Medical Center*, 850 F.3d 545 (3d Cir. 2017).  Unlike its sister courts, the Third Circuit concluded that Title VII does not displace sex-based employment discrimination claims brought under Title IX.  *Id.* at 560.  Extrapolating from *Johnson*, *Brown*, *Cannon*, *Bell*, *Franklin*, and *Jackson*, the Third Circuit adduced several guiding principles.  *Id.* at 560–62.  "*First* private-sector employees aren't 'limited to Title VII' in their search for relief from workplace discrimination."  *Id.* at 562 (quoting *Johnson*, 421 U.S. at 459).  "*Second* it is a matter of 'policy' left for Congress's constitutional purview whether an alternative avenue of relief from employment discrimination might undesirably allow circumvention of Title VII's administrative requirements."  *Doe*, 850 F.3d at 562 (citing *Bell*, 456 U.S. at 535 n.26).  "*Third* the provision implying Title IX's private cause of action, 20 U.S.C. § 1681(a), encompasses employees, not just students."  *Doe*, 850 F.3d at 562

---

[10] *abrogated on other grounds in Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246 (2009).

(citing *Bell*, 456 U.S. at 520 and *Cannon v. Univ. of Chicago*, 441 U.S. 677, 694 (1979)). "*Fourth* Title IX's implied private cause of action extends explicitly to *employees* of federally-funded education programs who allege sex-based *retaliation* claims under Title IX." *Doe*, 850 F.3d at 562 (*Jackson v. Birmingham Bd. of Ed.*, 544 U.S. 167, 171 (2005)). All of these principles, the Third Circuit reasoned, supported recognition of an implied private right of action in Title IX for employment discrimination claims.

The Second Circuit has not addressed this issue, and the district courts in this Circuit are currently divided. *Compare Gayle v. Children's Aid Coll. Prep Charter Sch.*, No. 18-cv-09874 (GBD), 2019 WL 3759097, at *5–*6 (S.D.N.Y. July 29, 2019) (concluding there is no private remedy for employment discrimination claims under Title IX); *Uyar v. Seli*, No. 3:16-cv-00186, 2017 WL 886934, at *6 (D. Conn. Mar. 6, 2017) (same); *Philpott v. New York*, 252 F. Supp. 3d 313, 319 (S.D.N.Y. 2017) (same); *Urie v. Yale Univ.*, 331 F. Supp. 2d 94, 97–98 (D. Conn. 2004) (same); *and Vega v. State Univ. of N.Y. Bd. of Trustees*, No. 97-cv-05767 (DLC), 2000 WL 381430, at *3 (S.D.N.Y. Apr. 13, 2000) (same) *with Doe v. Cent. Conn. State Univ.*, No. 3:19-cv-00418 (MPS), 2020 WL 1169296, at *7 (D. Conn. Mar. 11, 2020) (concluding Title IX provides a private remedy for employment discrimination claims); *Hauff v. State Univ. of N.Y.*, No. 18-cv-07256 (DRH) (ARL), 2019 WL 6498256, at *8 (E.D.N.Y. Dec. 3, 2019) (same); *and Henschke v. N.Y. Hosp.-Cornell Med. Ctr.*, 821 F. Supp. 166, 172 (S.D.N.Y. 1993) (same).

**Analysis**

For the reasons that follow, this Court agrees with those courts that have concluded that there is no private remedy under Title IX for employment discrimination claims.

Turning first to the legislative history of Title IX, it is clear that Congress intended for the Department of Education (formerly, HEW) to be able to regulate workplace practices and

withdraw federal funding for Title IX violations in the employment context.  It is entirely unclear, however, whether Congress anticipated that claimants would use Title IX as a vehicle for asserting quintessential employment discrimination claims, rather than utilizing the comprehensive remedial scheme established by Title VII.  Although it was initially proposed that the Education Amendments would be used to close the "loopholes" in Title VII, Congress ultimately chose to close those loopholes with the 1972 Amendments, which amended Title VII.  As the Fifth Circuit aptly observed, the notion that Congress intended to create a bypass of Title VII's intricate administrative procedures a mere three months after extending Title VII to governmental employees and educational institutions "is an extraordinary proposition."  *Lakoski*, 66 F.3d at 756.  In this Court's view, the timing of the passage of the 1972 Amendments, followed by the removal from Title IX references to identical remedial provisions, and the subsequent passage of Title IX create a compelling inference that Congress did not intend Title IX to provide a private right of action for employment discrimination.  Instead, the more reasonable interpretation of the legislative history, especially in light of *Bell*, is that "Congress chose two remedies for the same right, not two rights addressing the same problem"—a private remedy under Title VII and an administrative remedy under Title IX.  *Id.* at 757.

The Supreme Court's precedent interpreting Title IX does not command a contrary conclusion.  The Supreme Court has never addressed, in *dicta* or otherwise, how Title IX's implied private remedy will apply to employment claims or the relationship between Title VII and Title IX.  Othon argues, and the *Doe* Court agreed, that *Jackson* significantly changed the legal landscape of Title IX in the employment context.  This Court disagrees.  Jackson's claim was based on the school board "retaliating against him for protesting the discrimination against the girls' basketball team," not discriminatory employment practices.  *Jackson*, 544 U.S. at 172.

In fact, Jackson, as the district court held, had no actionable claim under Title VII. *Jackson v. Birmingham Bd. of Educ.*, No. 01-cv-01866 (TMP), 2002 WL 32668124, at *2 (N.D. Ala. Feb. 25, 2002) ("Title VII prohibits retaliation only for complaints concerning or opposition to employment practices that are illegal under Title VII."). The same would be true were such a case brought in this Circuit. *See Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001) ("It is axiomatic that mistreatment at work . . . is actionable under Title VII only when it occurs because of an employee's sex, or other protected characteristic. In determining whether an employee has been discriminated against because of *such individual's* . . . sex, the courts have consistently emphasized that the ultimate issue is the reasons for *the individual plaintiff's* treatment, not the relative treatment of different *groups* within the workplace." [citations omitted; internal quotation marks omitted]); *e.g.*, *Price v. Wilton Pub. Sch. Dist.*, No. 3:97-cv-02218 (AVC), 1998 WL 2027632, at *7 (D. Conn. Sept. 23, 1998) (holding that coach's employment discrimination claim which was based on gender of female athletes he coached "cannot be subsumed within Title VII because Title VII does not prohibit discrimination against teachers based on the gender of their students"). And without recourse under Title VII, Jackson may have been left with no remedy for his retaliatory removal as the girls' basketball coach if the Supreme Court did not recognize his claim under Title IX. *Jackson*, 544 U.S. at 180–81 ("[I]f Title IX's private right of action does not encompass retaliation claims, the teacher would have no recourse if he were subsequently fired for speaking out [about a principal sexually harassing a student]. Without protection from retaliation, individuals who witness discrimination would likely not report it, indifference claims would be short circuited, and the underlying discrimination would go unremedied."). Accordingly, *Jackson* does not shed light on the impact of Title VII on the implied private remedies afforded by Title IX because the Supreme Court had no need to grapple with the issue presented here.

The only case in which the Supreme Court has addressed whether Title IX encompasses employment discrimination is *Bell*. But, as previously indicated, *Bell* was "a challenge to the validity of administrative regulations terminating federal funding of educational institutions that discriminated on the basis of sex in their employment practices. *Bell* was not a claim by an individual for money damages for discrimination. In *Bell*, unlike here, a private remedy for aggrieved employees under Title VII did not affect, much less undermine, the validity of regulations for terminating federal funding." *Lakoski*, 66 F.3d at 754. As a result, "this authority is a far cry from holding that Title IX also authorized, like Title VII, private causes of action in this court by the employee to remedy such discrimination." *Gardner v. St. Bonaventure Univ.*, 171 F. Supp. 2d 118, 128 (W.D.N.Y. 2001).

That the Supreme Court has never had occasion to consider the interplay of Title IX and Title VII in the employment context is, in the Court's view, significant. In finding an implied right of action in *Cannon*, the Court appears to have been influenced by HEW's candid admission "that it does not have the resources necessary to enforce Title IX in a substantial number of circumstances." *Cannon*, 441 U.S. at 708 n.42. As a result, not recognizing a private remedy could have been "far more disruptive of HEW's efforts efficiently to allocate its enforcement resources under Title IX than a private suit against the recipient of federal aid could ever be." *Id.* at 706 n.41. This was because "if no private remedy exists, the complainant is relegated to a suit under the Administrative Procedure Act to compel the agency to investigate and cut off funds." *Id.* These concerns are not present in the employment context where claimants can seek relief under Title VII, as Othon has done in this case, or other remedial statutes that existed at the time Title VII was enacted.

Othon, relying on *Johnson*, contends that Title VII does not preclude her claims. As discussed above, the Supreme Court held in *Johnson* that Title VII is generally not a preclusive statute. *Johnson*, 421 U.S. at 461. But the Supreme Court has declined to recognize concurrent remedies where the statute at issue does not create independent, substantive rights and was enacted subsequent to Title VII. *E.g.*, *Great Am. Fed. Sav. & Loan Ass'n v. Novotny*, 442 U.S. 366, 376–78 (1979); *Brown v. Gen. Servs. Admin.*, 425 U.S. 820, 834–35 (1976).

The Court recognizes that Title IX does create substantive rights. But in the employment context those rights are indistinguishable from the rights conferred by Title VII. Both statutes protect individuals from sex-based employment discrimination, and nothing in the statutory language suggests that there is any material difference in the substantive rights conferred by these statutes.[11] *Lakoski*, 66 F.3d at 756. In fact, courts apply Title VII substantive standards to Title IX claims, reinforcing the parity of the statutes. *Doe v. Columbia Univ.*, 831 F.3d 46, 55 (2d Cir. 2016) ("[Title VII and Title IX] claims have so much in common that, at least on certain sorts of facts, rules the Supreme Court established for Title VII litigation appear to apply also to such similar claims of sex discrimination under Title IX"); *Summa v. Hofstra Univ.*, 708 F.3d 115, 131 (2d Cir. 2013) ("Title VII and Title IX are governed by the same substantive standards for reviewing claims of both harassment and retaliation."); *Yusuf v. Vassar Coll.*, 35 F.3d 709, 714 (2d Cir. 1994) ("Because the statutes share the same goals and because Title IX mirrors the substantive provisions of Title VI . . . , courts have interpreted Title IX by looking to the body of law developed under Title VI, as well as the caselaw interpreting Title VII." [citation omitted]).

---

[11] *Compare* 42 U.S.C. § 2000e-2(a)(1) (providing that it shall be unlawful for employers "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex") *with* 20 U.S.C. § 1681(a) (providing that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance").

Title IX was also enacted after Title VII.  In *Novotny*, the Supreme Court seemed to draw a distinction between statutes that preceded Title VII and those that followed.  *Novotny*, 442 U.S. at 376 (noting that the case did not present "a question of implied repeal" and "thus differs markedly from the cases recently decided by this Court that have related the substantive provisions of last century's Civil Rights Acts to contemporary legislation conferring similar substantive rights").  Given the elaborate and comprehensive nature of Title VII, "in enacting Title VII, Congress presumably intended to leave intact only pre-existing alternative remedies, not to permit future overlapping avenues of relief unless it explicitly announced, in the course of providing the subsequent remedy, that it was to be in addition to Title VII."  *Storey v. Bd. of Regents of Univ. of Wis. Sys.*, 600 F. Supp. 838, 842 (W.D. Wis. 1985); *accord Gayle v. Children's Aid Coll. Prep Charter Sch.*, No. 18-cv-09874 (GBD), 2019 WL 3759097, at *6 (S.D.N.Y. July 29, 2019); *Vega v. State Univ. of N.Y. Bd. of Trustees*, No. 97-cv-05767, 2000 WL 381430, at *3 (S.D.N.Y. Apr. 13, 2000); *Burrell v. City Univ. of N.Y.*, 995 F. Supp. 398, 410 (S.D.N.Y. 1998).  As discussed above, there is no indication that Congress intended to create concurrent private remedies when passing Title IX.  To the contrary, this Court believes that the legislative history of the 1972 Amendments, read in conjunction with the legislative history of the Educational Amendments, reflect Congress' selection of Title VII as the available private remedy for claims of employment discrimination.  The disruption recognizing such a right would cause to Title VII further counsels against such recognition.  *Storey v. Bd. of Regents of Univ. of Wis. Sys.*, 604 F. Supp. 1200, 1205 (W.D. Wis. 1985) ("Much stronger indicia than those noted in *Cannon* are required to persuade me Congress intended to imply remedies for employment-related discrimination, altering and disturbing the comprehensive and elaborate Title VII mechanism."); *Burrell*, 995 F. Supp. at 410 (same).

Finally, citing *North Haven Board of Education v. Hufstedler*, 629 F.2d 773 (2d Cir. 1980),[12] Othon argues that the Second Circuit will take a contrary view of this authority and agree that Title IX's private remedy encompasses employment discrimination claims. The Court disagrees that *Hufstedler* presages the Second Circuit's view on this issue. *Hufstedler* addressed only whether HEW had the authority to issue Subpart E. *Id.* at 774. In concluding that it did, the Second Circuit observed that the "[o]verlapping jurisdiction in the area of employment discrimination is well recognized." *Id.* at 784. It is this language on which Othon relies. In the following sentence, however, the Second Circuit explained:

> We visualize Congress as in effect saying that individual employees may exercise their rights under either Title VII or the Equal Pay Act, but that HEW may use its powers to threaten to withdraw federal funds or actually withdraw them if necessary when a recipient of federal financial assistance practices discrimination on the basis of sex.

*Id.* at 784–85. Later, the Second Circuit reiterated:

> [O]ur reading of the statutory scheme leads us to conclude that Congress intended HEW to have available the potent remedy of fund withdrawal to ensure compliance with the prohibition against sex discrimination in employment rather than rely solely on the important, but usually piecemeal, sanctions available to aggrieved employees under Title VII and the Equal Pay Act.

*Id.* at 785. Both of these observations are reminiscent of the Fifth Circuit's determination in *Lakoski* that "Title VII provided *individuals* with administrative and judicial redress for employment discrimination, while Title IX empowered *federal agencies* that provided funds to educational institutions to terminate that funding upon the finding of employment discrimination." *Lakoski*, 66 F.3d at 757.

---

[12] *aff'd N. Haven Bd. of Ed. v. Bell*, 456 U.S. 512 (1982).

***

The Supreme Court has instructed that "unless . . . congressional intent can be inferred from the language of the statute, the statutory structure, or some other source, the essential predicate for implication of a private remedy simply does not exist." *Nw. Airlines, Inc. v. Transp. Workers Union of Am., AFL-CIO*, 451 U.S. 77, 94 (1981). In this case, there is insufficient evidence that Congress intended to create a private right of action for employment discrimination claims under Title IX, thereby allowing a special subclass of claimants to bypass the prerequisites of Title VII. Nor is there any inference to be drawn that Congress intended to provide employees of federally funded programs with greater remedies than other employees. Accordingly, Wesleyan's motion to dismiss Counts Three and Four is granted.

**Conclusion**

For the reasons set forth in this decision, Wesleyan's motion to dismiss [ECF No. 59] is GRANTED. Counts Three and Four of the Amended Complaint are dismissed with prejudice.

**SO ORDERED** at Bridgeport, Connecticut, this 27th day of March 2020.

 */s/ Kari A. Dooley*
KARI A. DOOLEY
UNITED STATES DISTRICT JUDGE